UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| UNITED STATES | : |  |
|---|---|---|
|  | : |  |
| v. | : |  |
|  | : | CASE NO. 3:18-CR-137(RNC) |
| JOHNATHEN LOPEZ, | : |  |
|  | : |  |
| Defendant. | : |  |

RULING AND ORDER

Johnathen Lopez is charged with unlawful possession of a
firearm by a convicted felon in violation of 18 U.S.C.
§ 922(g)(1).  He has moved to suppress the firearm, a Glock
pistol, on the ground that it was taken from his vehicle in
violation of his right under the Fourth Amendment to be free
from unreasonable searches and seizures.  An evidentiary hearing
has been held.  The pistol was recovered during a search of Mr.
Lopez's vehicle in a parking lot in a "high-crime area."  The
parked vehicle, in which Mr. Lopez was seated, drew the
attention of officers performing a "proactive patrol" of the
area, and his reaction to their presence prompted them to
investigate.  His subsequent failure to cooperate led to a
search of his vehicle and recovery of the weapon.  The parties
dispute whether the officers' conduct was lawful under Terry v.
Ohio, 392 U.S. 1 (1968), which authorizes police officers to
conduct investigative stops based on reasonable suspicion of
criminal activity and also authorizes pat-down searches when

1

officers have reason to think that the individual with whom they are dealing may be armed and dangerous.

Proactive patrols in high-crime areas can lead to actions by police officers that test the limits of their discretionary authority under <u>Terry</u>. Motions to suppress give courts an opportunity to try to clarify those limits in a manner that provides helpful guidance to officers and reduces the risk of violations of Fourth Amendment rights. This is an important function, of course, but no court ruling can eliminate the risk of unconstitutional conduct by patrol officers. Officers engaged in proactive patrols are necessarily vested with discretion when interacting with individuals on the street; street encounters are not always videotaped or witnessed by third parties; and in a swearing contest at a suppression hearing, the testimony of the police officer who recovered the evidence is apt to seem more credible than that of the person seeking its suppression. Thus, it is the individual officer's commitment to act honestly and in good faith at all times that provides the ultimate safeguard of constitutional rights.

The importance of an officer's honesty and good faith to the protection of Fourth Amendment rights is highlighted by cases like the present one, in which the witnesses' accounts of the key facts diverge dramatically. Having considered the testimony of the witnesses at the evidentiary hearing in light

of the record as a whole, I find the officer's testimony more credible than that of the defendant, Mr. Lopez. Accepting the officer's version as more likely true than not true on the record before me, I conclude that Mr. Lopez's reaction to the officer's presence justified a Terry stop.[1] I further conclude that Mr. Lopez's subsequent conduct in response to the officer's approach to his vehicle – most significantly, his persistent refusal to comply with lawful orders – provided a sufficient basis under the principles of Terry to remove him from the vehicle and conduct a protective search of the area of the passenger compartment where the gun was found. Accordingly, the motion to suppress is denied.

## I. Background

Officer Juan Rivera, the arresting officer and the government's principal witness, is a member of the Street Crimes Unit of the Waterbury Police Department, which is assigned to address "quality of life issues," such as "weapons, narcotics, [and] prostitution" by "proactive patrols." On the night of April 27, 2018, Rivera and another officer, Officer Hoffler, were patrolling Gilyard Drive in Waterbury. This area is the source of frequent complaints to the Waterbury Police

---

[1] The conduct at issue here did not involve an actual "stop" in the usual sense of the word. Consistent with the wording used in the case law, however, I will refer to the conduct as a "stop" or "Terry stop."

Department, but Rivera and Hoffler were not responding to any particular complaints that night. The officers were in an unmarked patrol car, but both were in uniform, and Rivera testified that the unmarked Crown Victoria he was driving was commonly recognized as a police vehicle.

At about 9:00 PM, Officer Rivera's attention was drawn to two vehicles – a black Honda and a red Chevy Impala - parked next to each other in a parking lot next to Gilyard Drive not far from an apartment building known for drug activity. Each car was parked facing outward. Rivera testified that the Honda's engine was running, but he could not recall if the Impala's was as well. Rivera's training and experience led him to suspect that the cars' occupants were conducting a drug deal. As he explained at the evidentiary hearing, "parking lots like that are commonly used to conduct drug sales," and "[m]ost individuals that conduct drug sales will often back into the spot" in order to be able to "flee the scene quickly instead of backing up" in the event police arrive in the area.

The parking lot where the two cars were parked is shown by the following Google satellite image.[2]

---

[2] Government's Exhibit 1 is a printed screenshot from Google Maps. The image below is an identical screenshot also taken from Google Maps, rather than a photograph of the printed Exhibit 1 itself.

4



As depicted in the photo, the parking lot is small, with a
single narrow opening onto Gilyard Drive, which serves as the
only entrance and exit.  Using the photo as a guide, Rivera
testified that the Honda and Impala were parked on the lower
side of the lot near the entrance/exit, such that when he turned
left into the lot from Gilyard Drive, the two cars were almost
immediately on his left.  Government's Exhibit 2 demonstrates
that Lopez's car, the black Honda, was in the second parking
spot from the entrance, with the Impala one spot deeper into the
lot.  See Tr. 57:22-24; Gov't Exh. 2.

The parties' versions of what happened are irreconcilable. The government's version is summarized in Rivera's police report of the incident and described in greater detail in his hearing testimony. According to the officer, as he drove past the Black Honda, he "saw Lopez notice the police vehicle, quickly reach towards his waistband, and place his driver's side seat back while placing an item in the rear passenger side of the vehicle." Govt. Ex. 10 (incident report). Rivera knew from his training and experience that people who "possess weapons will often carry them in their waistband area and will quickly try to discard them once they notice the police presence to avoid arrest." Accordingly, he stopped and exited his police vehicle to investigate. As he approached Lopez's vehicle, he told Lopez in a loud voice, "Show me your hands," but Lopez did not comply. Instead, Lopez continued to reach with his right hand behind the front passenger seat. Rivera feared that Lopez could have a weapon and therefore opened the driver's door while telling Lopez to stop moving and show his hands. Lopez ignored these commands. Rivera grabbed Lopez's left hand and applied pressure to his bent wrist to force him to comply. Rivera's use of this "pain compliance technique" was successful. Lopez was handcuffed, removed from the vehicle and placed in the back of the cruiser. Rivera then returned to Lopez's vehicle and looked

behind the front passenger seat, where he found the Glock
pistol.

Officer Rivera's police report makes no mention of his use
of a flashlight, and the defendant relies on this omission as a
basis for discrediting Rivera's entire account.  The parties
agree that it was too dark for the officers to see the interior
of Lopez's vehicle without a flashlight.  However, at the
hearing, Rivera credibly testified that he used a flashlight
throughout the encounter.  He testified that as he drove past
Lopez's car, he shined a flashlight through Lopez's windshield.
Tr. 17:5-10.  Lopez reacted with a "surprised face," then made
the movements described above.  Tr. 17:5-10.[3]

In his testimony at the hearing, Lopez provided the
following version of the events.  He was parked in the lot
because he knew somebody who lived in a nearby apartment.
Before the police arrived, he had been talking or arguing with
people in the Impala.  He then "shut the car off," "rolled up
the window," and "just laid back."  Tr. 69:25-70:4.  His
driver's seat was deeply reclined, which is the way he always
kept it even while driving.  The Glock pistol was never in his

---

[3] Officer Rivera did not recall whether he also shined the
flashlight into the other car.  Tr. 43:9-15.  He also did not
recall at what point he put the flashlight down.  <u>See</u> Tr. 43:13-
44:24.

waistband. He thought it would be dangerous to keep the pistol in his waistband because he had been led to believe that the pistol had no safety. Tr. 70:22-71:7; see also Tr. 81:11-16 (Lopez responding to government's assertion that a Glock has three internal safeties by saying "I believe they don't have any safeties"). Rather, he kept the gun under the front passenger seat where it could not be seen. Tr. 71:8-11. Lopez "didn't see the officers drive up," Tr. 74:6, and was unaware of their presence until Rivera banged on the side of his window while yelling. Tr. 70:4-7. Rivera did not have a flashlight. Tr. 70:12-13. Lopez opened the driver's door and Rivera immediately "grabbed [him] and bent [his] wrist." Tr. 70:14-18. Lopez at no time made any movement toward the rear passenger compartment of his car. Tr. 70:19-21.

## II. Discussion

A. Legal Standards

The issue presented by the motion to suppress is whether the officers violated Mr. Lopez's Fourth Amendment right to be free from unreasonable searches and seizures. In his memorandum, Mr. Lopez argues that the officers conducted a Terry stop "without probable cause and without any reasonable suspicion of a crime being committed." Def. Mem. (ECF No. 54), at 1. The government maintains that "the totality of the circumstances gave rise to a reasonable suspicion that Lopez was

reaching for a weapon or attempting to conceal something illegal

in his vehicle . . . sufficient for officers to conduct an

investigatory detention to explore further in either confirming

or dispelling their suspicions."  Gov't Mem. (ECF No. 55) at 7.

Under the Fourth Amendment, "the ultimate measure of the

constitutionality of a government search or seizure is

reasonableness."  United States v. Bailey, 743 F.3d 322, 331

(2d Cir. 2014)(internal quotations omitted).  The reasonableness

of a search or seizure is "generally determined by balancing

"the particular need to search or seize against the privacy

interests invaded by such action."  Id. (citing Terry, 392 U.S.

at 20-21).

In Terry, the Supreme Court addressed the interests

involved in an investigative detention of a person suspected of

criminal activity.  Under Terry, "an officer may, consistent

with the Fourth Amendment, conduct a brief, investigatory stop

when the officer has a reasonable, articulable suspicion that

criminal activity is afoot."  Illinois v. Wardlow, 528 U.S. 119,

123 (2000)(citing Terry, 392 U.S. at 30).  Terry also permits a

pat-down, or frisk, of a detainee's outer clothing for the

presence of a weapon as a protective measure if the officer has

an articulable suspicion that the individual is armed and

dangerous.  See Terry, 392 U.S. at 28; Arizona v. Johnson, 555

U.S. 323, 326-27 (2009)(pat-down of passenger during traffic

stop justified if officer has reasonable basis to think person stopped is armed and dangerous).

In Michigan v. Long, 463 U.S. 1032 (1983), the Supreme Court extended the principals of Terry to permit an officer to conduct a protective search of the passenger compartment of a vehicle for weapons when the officer has a reasonable basis to think the individual with whom he is dealing is armed and potentially dangerous. See id. at 1051-52 (officers conducting Terry investigation did not act unreasonably in searching passenger compartment for weapons before permitting suspect to reenter vehicle).

"Reasonable suspicion to conduct a Terry stop exists when a law enforcement officer can 'point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.'" United States v. Bell, 733 Fed. App'x 20, 21 (2d Cir. 2018) (quoting Terry, 392 U.S. at 21 (alteration omitted)). A Terry stop is not necessarily unreasonable even if the facts available suggest "less than a fair probability of wrongdoing." Id. An officer need only have a "reasonable basis to think that the person to be detained 'is committing or has committed a criminal offense.'" Bailey, 743 F.3d at 332 (quoting Johnson, 555 U.S. at 326). In reaching this conclusion, an officer is "entitled to draw on his own experience and specialized training to make

inferences" but may not "rely on an inchoate and unparticularized suspicion or hunch." United States v. Padilla, 548 F.3d 179, 187 (2d Cir. 2008). In determining whether an officer had reasonable suspicion warranting a Terry stop, a court "must consider the totality of the circumstances surrounding the stop" and "evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training." United States v. Bayless, 201 F.3d 116, 133 (2d Cir. 2000) (internal citations and quotation marks omitted).

B.   Findings of Fact

After considering the record evidence, and having had an opportunity to assess the credibility of the witnesses, I think Officer Rivera's testimony concerning the relevant events is more credible than that of Mr. Lopez. Crediting Rivera's testimony concerning the disputed issues of material fact, I make the following findings of fact:

- Rivera's attention was drawn to Lopez's vehicle for the reasons he described (the hour, the location, the manner in which the two cars were parked, and the fact that the engine of at least one of the cars was running).

- As Rivera drove past Lopez's vehicle, he used a flashlight to illuminate the interior of the vehicle and saw

Lopez react in the manner Rivera described in his incident report and hearing testimony.

- Rivera's training and experience led him to suspect that Lopez was engaged in drug activity and trying to conceal contraband, a weapon, or both. Rivera therefore stopped and exited his patrol car to investigate.

- Rivera approached Lopez's vehicle and yelled at him to stop moving and show his hands. Lopez failed to comply, and Rivera feared Lopez might have a gun.

- Lopez failed to comply with Rivera's commands until Rivera used the pain compliance technique he described. Rivera then handcuffed Lopez, removed him from the vehicle and placed him in the patrol car.

- A reasonable officer in Rivera's position would not ignore the risk posed by a gun in the vehicle, especially because of Lopez's failure to comply with the officer's orders until a pain compliance technique was used to force his compliance. Rather, a reasonable officer in these circumstances would conduct a protective search of the vehicle.

- Rivera undertook a protective search of the vehicle and quickly discovered the Glock pistol on the floor of the rear passenger compartment within an arm's length of the driver's seat.

Lopez argues that I should decline to credit Rivera's testimony because his report makes no mention of a flashlight being used. Rivera credibly testified that use of a flashlight during a proactive patrol is standard procedure and that he and his fellow officers "commonly" do not explicitly note the use of a flashlight in their reports. This testimony is uncontroverted.[4] It would be surprising to me if an officer patrolling a high-crime area after dark failed to use a flashlight when necessary to see into a vehicle suspected of involvement in drug activity. And because using a flashlight is standard procedure, Rivera's failure to mention it in his report is unsurprising. I readily agree that Officer Rivera should have mentioned his use of the flashlight in order to create a report that was complete and accurate in all material respects, as his duty required him to do. On the record before me, however, his failure to do so is not so concerning as to undermine the credibility of his testimony.

Lopez also argues that Rivera's testimony is inherently incredible in certain respects. He argues that it would have

_____

[4] Lopez called as a witness a twenty-year veteran of the Connecticut State Police, but he was not asked whether, in his experience, use of a flashlight is standard procedure in circumstances like the ones presented here. Nor was he asked whether an officer's use of a flashlight in such circumstances is typically mentioned in a police report.

been impossible for Rivera to see his waistband.  I agree Rivera was not in a position to see Lopez's waistband as he drove past Lopez's vehicle.  However, Rivera did not have to be in a position to see Lopez's waistband in order to conclude that Lopez was reaching in that direction.  Lopez also argues that Rivera's testimony describing the way Lopez moved his right arm above his shoulder "makes no sense."  I agree that a person in Lopez's position might be careful to avoid raising his arm over the passenger seat where it could be seen by the officers.  But it does not follow that Rivera's testimony "makes no sense."  A person in Lopez's predicament might try to hide the gun by putting it on the floor behind the passenger seat.  A quick and easy way to do that would be to use his right arm to move the gun over the passenger seat then onto the floor.  That might be quicker and easier than trying to maneuver the gun through the narrow space between the front seats.  <u>See</u> Gov't Exh. 5, 6. (demonstrating narrow space between front seats).  And it might well be safer if (as Lopez believed) the gun lacked a safety.  I therefore see no reason to reject Rivera's testimony as inherently incredible.

Mr. Lopez's testimony concerning the relevant events is less persuasive than Rivera's.  He asks me to believe that he was simply sitting in his car, having switched the engine off, with no plans to do anything except sit there.  Mr. Lopez's only

explanation for being in the parking lot is that he knew somebody who lived nearby. There is no indication he was there to visit that person on the night in question, so he seems to be suggesting that he chose to park there just because he had some familiarity with the place. There is no evidence that other visitors to the neighborhood felt free to use the small parking lot as a place to rest and relax. And it seems an odd choice for Mr. Lopez to make given the regularity with which the area was patrolled by police.

Mr. Lopez also asks me to believe that he was unaware of the officers' presence until Rivera banged on his window in the dark. Though I cannot be certain, I doubt that a person unlawfully possessing a pistol in a high-crime area subject to frequent proactive patrols by police would be so utterly indifferent to his surroundings that he would fail to notice the officers drive up in a patrol car. I assume the officers were using their headlights. And Mr. Lopez does not claim to have been asleep. By his own account, Mr. Lopez had been interacting (even "arguing") with the occupants of the Impala, and he had the Glock with him for self-protection. I also doubt that Rivera approached the two vehicles in the dark without a flashlight. A reasonably cautious officer would not take that risk, especially when a flashlight is readily available and use of a flashlight is standard procedure.

Finally, Mr. Lopez asks me to believe that although all he did in response to Rivera's loud banging on the car window was promptly open the door, Rivera nonetheless immediately subjected him to a pain compliance technique, handcuffed him and removed him from the car. I find this implausible as a general matter. And having paid close attention to Officer Rivera during the hearing, I have difficulty envisioning him engaging in such a malicious abuse of his authority.

Mr. Lopez's testimony may be more reliable than that of Officer Rivera with regard to one matter - the weather that night. Rivera testified it was a clear night and it "wasn't raining while this incident happened." Lopez, however, testified it "was raining." On cross-examination, he clarified that "[i]t wasn't raining a lot, but it was kind of like drizzly." The government introduced into evidence several photos of the scene, which show puddles of water on the ground, moisture on Lopez's windshield, and raindrops on the camera lens. See Tr.65:3-9, 19-21. This evidence tends to corroborate Lopez's testimony. However, it does not conclusively demonstrate that it was raining at the time of the encounter between Rivera and Lopez and, in any case, the credibility of Rivera's version of events is not contingent on the weather being clear.

In a similar vein, the defendant insists that the parking lot was very dark – darker than shown by the police photographs of the scene. But there is no dispute the parking lot was dark, and the defendant's argument that it was very dark does not undercut the credibility of Rivera's testimony. If anything, it tends to reinforce my conclusion that Rivera probably used a flashlight although it is not mentioned in his report.

## C.  Legal Basis to Detain Lopez

The first step in analyzing the issues presented by the parties is determining when the encounter between the officers and Mr. Lopez became a Terry stop. See United States v. Reid, No. 17-cr-20172-SHL, 2018 WL 3056696, at *3 (W.D. Tenn. Mar. 6, 2018) ("This court must initially determine when the Terry stop began, prior to analyzing its propriety."), adopted by 2018 WL 1911137 (W.D. Tenn. Apr. 23, 2018). Determining when the encounter became a Terry stop is particularly important in this case. Crediting Officer Rivera's testimony, the officers suspected that the occupants of the two vehicles might be engaged in a drug transaction based on the time of day, the location of the cars, the manner in which the cars were parked, and the fact that the engine of at least one of the cars was running. This combination of circumstances was insufficient to support an objectively reasonable suspicion of criminal activity required for a Terry stop. It was Lopez's behavior in response

17

to the officers' presence, as described by Rivera at the
hearing, in combination with the other facts, that provided the
requisite reasonable suspicion.  Because I conclude that Lopez
was not seized until after Rivera exited the cruiser and
approached Lopez's vehicle on foot, Lopez's suspicious behavior
may be taken into account, and, accordingly, the stop was valid
at its inception.

　　　　1.　 Inception of the Stop

　　　A Terry stop begins when an individual is seized for
purposes of the Fourth Amendment.  See, e.g., United States v.
Price, 599 F.2d 494, 498-99 (2d Cir. 1979) (treating question of
when Terry stop began and when defendant was seized as
identical).  A seizure requires "either physical force . . . or,
where that is absent, submission to the assertion of authority."
United States v. Swindle, 407 F.3d 562, 572 (2d Cir. 2005)
(quoting California v. Hodari D., 499 U.S. 621, 626 (1991)).  As
to the latter circumstance, an individual is seized when, "under
the circumstances, a reasonable person would have believed that
he was not free to leave."  United States v. Compton, 830 F.3d
55, 65 (2d Cir. 2016); United States v. Baldwin, 496 F.3d 215,
218 (2d Cir. 2007) ("We hold that, to comply with an order to
stop – and thus to become seized – a suspect must do more than
halt temporarily; he must submit to police authority, for 'there

is no seizure without actual submission.'" (quoting <u>Brendlin v. California</u>, 551 U.S. 249 (2007))).

A seizure amounting to a <u>Terry</u> stop occurs when an officer uses his patrol car to "box in" an individual's car, preventing the suspect from driving away.  <u>See</u> <u>Pane v. Gramaglia</u>, 509 Fed. App'x 101, 103 (2d Cir. 2013) (holding, at qualified immunity stage, that it was clearly established that blocking a parked car was a seizure); <u>see also</u> <u>id.</u> (collecting cases).  Similarly, an officer's use of his cruiser lights also may constitute a seizure "in the sense that no reasonable driver would think that he was free to leave."  <u>United States v. Hernandez</u>, 63 Fed. App'x 6, 9 (2d Cir. 2003).  An individual may also be seized when officers deliver instructions to the individual in a way that makes it clear compliance is mandatory.  <u>See, e.g.</u>, <u>Ligon v. City of N.Y.</u>, 925 F. Supp. 2d 478, 542-43 (S.D.N.Y. 2013) ("Encounters involving nothing more than commands or accusatory questioning can and routinely do rise to the level of <u>Terry</u> stops, provided that the commands and questioning would lead a reasonable person to conclude he was not free to terminate the encounter.").

Applying the above principles to the circumstances presented in this case, I conclude that the <u>Terry</u> stop began when Officer Rivera exited his patrol car and approached Lopez's vehicle while shouting instructions.  Officer Rivera's actions

at that point would have made clear to a reasonable person in Lopez's position that he was not free to leave. See Compton, 830 F.3d at 65. Officer Rivera testified that he parked his car and approached Lopez's vehicle such that Lopez would have had to hit him to drive away, Tr. 58:11-17, and that as he approached the car he shouted at Lopez (or "t[old] him loudly") to stop rummaging behind the passenger seat. Tr. 18:12-17. Those actions, in light of the totality of the circumstances, constituted a seizure. See Pane, 509 Fed. App'x at 103; Ligon, 925 F. Supp. 2d at 542-43. See also United States v. Stanley, 915 F.2d 54, 55-56 (1st Cir. 1990) (holding that defendant was seized when officer arrived at driver's side of car, shined flashlight on him, and shouted "Police, freeze").

In so holding, I conclude that Officer Rivera's actions before he stopped the patrol car and got out did not constitute a seizure. Driving a patrol car slowly past a vehicle while shining a flashlight into the vehicle's interior does not unambiguously convey to a reasonable occupant of the vehicle that he or she is being detained. As long as the patrol car keeps moving, there is no seizure for purposes of the Fourth Amendment. The vehicle may be "boxed in" momentarily as the patrol car passes, but that is inconsequential in terms of its impact on interests protected by the Fourth Amendment. And while it is disquieting to imagine police in a dark parking lot

or other public place going from car to car using flashlights to look inside, use of a flashlight to illuminate the interior of a car does not constitute a seizure of the occupant for Fourth Amendment purposes. There are circumstances in which an officer's use of a flashlight may convey to a reasonable person that he or she is being detained, such as when an officer gestures with a flashlight to direct an individual to do something. But shining a flashlight into a car while driving by, without something more, does not convey that message. See United States v. Huertas, 864 F.3d 214, 215-17 (2d Cir. 2017) (holding that defendant was not seized when officer in squad car shined a spotlight on him and asked questions because defendant "never submitted to police authority"); Brown v. City of Oneonta, 221 F.3d 329, 340 (2d Cir. 2000) (describing question as a "close call" but ultimately holding that defendant was seized where officer pointed a spotlight at him, directed him to "come here," and told him to show his hands), overruled on other grounds by Gonzaga Univ. v. Doe, 536 U.S. 273 (2002); United States v. Barry, 394 F.3d 1070, 1075-76 (8th Cir. 2005) (holding that, where officer carrying lit flashlight and with his hand on his holstered weapon approached defendants in parked car and knocked repeatedly on their window, defendants were not seized until they were told by officer to exit vehicle; until that point, the officer "exhibited no show of authority, that is, he

never raised his voice, never drew his holstered weapon, [and] never activated his emergency lights").[5]

### 2. Factors Supporting Reasonable Suspicion

At the time Lopez was seized, the officers had reasonable suspicion of criminal activity based on articulable facts. The officers were in a high-crime area at night, and saw two adjacent vehicles backed into parking spots, one with its engine running. This led the officers to suspect a possible drug transaction. When a flashlight was used to illuminate the interior of the first vehicle, Officer Rivera saw Mr. Lopez react with surprise, move his seat back, reach for the area of his waistband with his right arm, then move his right arm up, over and behind the front passenger seat. These circumstances, viewed in their totality from the perspective of an experienced officer, provided a reasonable basis to suspect that the occupant of the car was committing or had committed a crime involving contraband. The officers were therefore entitled to stop the patrol car and get out to investigate.[6]

---

[5] Lopez does not contend that an officer's use of a flashlight in the circumstances presented here would constitute an unreasonable search under the Fourth Amendment. See Texas v. Brown, 460 U.S. 730, 740 (1983) ("[T]he use of artificial means to illuminate a darkened area simply does not constitute a search, and thus triggers no Fourth Amendment protection.").

[6] If Lopez was not seized until Officer Rivera opened his door and confronted him, Lopez's noncompliance with Rivera's commands provided additional reason for suspicion. But reasonable

a.  <u>The Location of the Stop</u>

Police officers "are not required to ignore the relevant
characteristics of a location in determining whether the
circumstances are sufficiently suspicious to warrant further
investigation."  <u>Wardlow</u>, 582 U.S. at 124.  As such, "the fact
that the stop occurred in a 'high crime area' [is] among the
relevant contextual considerations in a <u>Terry</u> analysis."  <u>Id.</u>
(quoting <u>Adams v. Williams</u>, 407 U.S. 143, 144 (1972)).  Officer
Rivera testified, and the defendant does not contest, that the
Gilyard Drive area is the origin of frequent calls to the
Waterbury Police Department regarding narcotics and weapons.
Accordingly, this contextual factor is properly considered part
of the totality of the circumstances presented here.  <u>See</u>
<u>Wardlow</u>, 582 U.S. at 124.[7]

_____

suspicion existed to briefly detain Lopez when he reacted
suspiciously to the flashlight.  As explained <u>infra</u>, Lopez's
further lack of compliance was legally significant in that it
justified a protective sweep of the vehicle's interior, which
revealed the weapon.

[7] As the Sixth Circuit has noted, "contextual factors, such as
high-crime [in an area], should not be given too much weight
because they raise concerns of racial, ethnic, and socioeconomic
profiling."  <u>United States v. Young</u>, 707 F.3d 598, 603 (6th Cir.
2012).  This is particularly a concern when, as in this case,
the area in question is residential, and the stop occurred not
in the dead of night but around 9:00 PM.  <u>See, e.g.</u>, <u>United</u>
<u>States v. Bellamy</u>, 592 F. Supp. 2d 308, 317 (E.D.N.Y. 2009)
(discounting defendants' presence in high-crime area near
apartment building where "these events occurred at approximately
8:30 PM, a time when it is typical for people to come and go
from an apartment dwelling").

23

b.   The Position of the Vehicles

Officer Rivera testified that he initially became suspicious upon seeing two cars backed into parking spots next to each other, one with its engine running.  Tr. 14:17-22. Rivera testified that, based on his experience and training, individuals conducting drug transactions frequently back into parking spots so that they may flee more easily.  Id.  Of course, there are also innocent reasons to back into a parking space – particularly in a narrow lot like the one involved here. But the existence of an innocent explanation for conduct does not preclude an officer from considering that conduct as a relevant factor in forming reasonable suspicion of criminal activity.  Conduct "that is 'as consistent with innocence as with guilt may form the basis for an investigative stop where there is some indication of possible illicit activity.'" Padilla, 548 F.3d at 187 (quoting United States v. Villegas, 928 F.2d 512, 516 (2d Cir. 1991)).  And "a series of acts, each of them perhaps innocent in itself," can warrant investigation when considered as a whole.  Terry, 392 U.S. at 22.  For example, the Second Circuit has confirmed that "the location of [a] car in a remote part of [a] parking lot" can legitimately influence an officer's reasonable suspicion of criminal activity.  United States v. Bold, 19 F.3d 99, 103 (2d Cir. 1994).  So too can the uncontroverted circumstances here.  See United States v.

Alvarez, 899 F.2d 833, 838 (9th Cir. 1990) (holding that officers had reasonable suspicion to initiate Terry stop when, among other things, defendant's vehicle "was unusually positioned – front end facing outward"), cert. denied 498 U.S. 1024 (1991).

    c.   Lopez's Reaction to the Police

    Having formed an initial suspicion of criminal activity, albeit one not sufficient to justify an investigatory detention, Officer Rivera drove the patrol car slowly past the vehicles. This was not unlawful; the police are entitled to conduct further investigation even in the absence of reasonable suspicion.  See Barry, 394 F.3d at 1075-76.  In doing so, he drove in front of Lopez's vehicle and shined a light through the windshield.  Lopez "quickly had a surprised face."  Tr. 17:4:10. He "reach[ed] towards his waistband, and place[d] his driverside seat back while placing an item in the rear passenger side of the vehicle."  Gov't Exh. 10.

    "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." Wardlow, 528 U.S. at 125.  Depending on the circumstances, an individual's reaction to the presence of a police officer can contribute to a reasonable suspicion of criminal activity.  See id. at 124 (holding that suspect's "unprovoked flight upon noticing the police" in high crime area reasonably aroused

officers' suspicion).  This includes not only headlong flight,
e.g., Bell, 733 Fed. App'x at 22 (Terry stop was justified
where, after engaging in suspicious activity, defendant turned
and walked away at sight of police officer and fled when ordered
to stop), but also other "nervous, evasive behavior." Wardlow,
528 U.S. at 119.

For example, "[c]ourts have consistently approved Terry
stops and frisks when a defendant has placed his hands out of a
police officer's line of vision." United States v. Torres, No.
02-cr-1433 (FB), 2003 WL 22272152, at *1 (E.D.N.Y. Oct. 3,
2003); see also Thomas v. Dillard, 818 F.3d 864, 877 (9th Cir.
2016) (listing relevant considerations in a reasonable suspicion
analysis, including "sudden movements" or "attempts to reach for
an object that was not immediately visible").  An officer may
reasonably believe that such movements amount to an attempt to
reach for a weapon or hide contraband.  E.g., United States v.
Bulluck, No. 09-cr-652 (PGG), 2015 WL 4998573, at *9 (S.D.N.Y.
Aug. 20, 2015) (officer had reasonable suspicion to search
plastic bags in vehicle after traffic stop where driver was
nervous when officer approached and the defendant "took a
plastic bag off his lap, threw it on the floor, and attempted to
push the bag under the driver's seat"); United States v. Torres,
No. 10-cr-1159 (JGK), 2011 WL 2209144, at *7 (S.D.N.Y. June 7,
2011) (search was justified when officers "saw the defendant

make a suspicious movement toward the dashboard" after traffic stop); United States v. Green, No. 99-cr-0309 (WHP), 1999 WL 1256239, at *3 (S.D.N.Y. Dec. 22, 1999) (concluding in dicta that search would have been justified when the officer "saw the defendant make a furtive movement toward the rear of the car with a black object in his hand"); United States v. Williams, No. 08-cr-114, 2008 WL 4889624, at *5 (E.D. La. Nov. 4, 2008) (holding that reasonable suspicion to detain defendant existed when defendant was "trying to duck down to avoid being seen" and "was seen reaching down near his feet as if he were trying to conceal something or possibly reach for a weapon").

It is important to clarify, however, that mere nervousness at the sight of the police is not sufficient to justify a reasonable suspicion of criminal activity; "[n]ervousness is a common and entirely natural reaction to police presence." United States v. McKoy, 428 F.3d 38, 40 (1st Cir. 2005).[8]  Nor, of course, is a look of surprise on the face of an occupant of a car when the dark interior of the car is suddenly illuminated by the beam of a flashlight.  It was the nature of Lopez's movements that is consequential here.  On this point, a

---

[8] As mentioned earlier, Officer Rivera testified that he and Officer Hoffler were in uniform, and that their unmarked patrol car was commonly recognized as a police vehicle.  Tr. 8:21-9:14.

comparison to McKoy – which Lopez cites – is instructive.  See
United States v. McKoy, 402 F. Supp. 2d 311 (D. Mass. 2004).

In McKoy, Judge Woodlock suppressed evidence obtained as a
result of a stop-and-frisk of a motorist when the government
relied on just three factors to justify the frisk: the
defendant's nervousness, the high-crime locale, and a brief
movement he made toward his center console on the officers'
approach.  See id. at 317-20.  While the stop was justified –
the defendant was parked illegally and was improperly displaying
his license plate – Judge Woodlock nonetheless concluded that
the frisk was not justified because the three articulable facts
did not create an objectively reasonable basis to believe that
the defendant was armed and dangerous.  Id. at 322.

The facts here are only narrowly different, but the
differences are significant.  First, McKoy was not suspected of
any crime that might involve a firearm.  See id. at 319; McKoy,
428 F.3d at 40.  Here, the officers suspected Lopez of being
involved in a drug transaction, and the link between drug
transactions and the possession of firearms is well-established.
Because of this link, courts in this circuit have regularly
sanctioned frisks when narcotics activity is suspected.  See,
e.g., United States v. Ramirez, No. 02-cr-1228 (GEL), 2003 WL
260572, at *5 (S.D.N.Y. Feb. 5, 2003) ("The Second Circuit has
recognized that an experienced police officer should be aware

that 'narcotics dealers frequently carry weapons.'" (quoting
United States v. Salazar, 945 F.2d 47, 50 (2d Cir. 1991));
United States v. Terry, 718 F. Supp. 1181, 1185 (S.D.N.Y. 1989)
("[O]fficers must be given leeway in a narcotics crime to
conduct a protective frisk . . . .").

Second, the movements observed by the officers in each case
differed in important ways.  In McKoy, the officers saw the
suspect "lean[] and move[] his arm toward the console area."
McKoy, 402 F. Supp. 2d at 312.  McKoy's actions were consistent
with a driver retrieving his vehicle registration.  See id. at
321 (noting the problem of a defendant being "deemed dangerous
if he reaches for his registration, turns off the radio, or puts
the car in park"); McKoy, 428 F.3d at 40 ("[T]he movement [was]
also consistent with reaching for a driver's license or
registration, a perfectly lawful action that is to be expected
when one is pulled over by the police.  The government's
proposed standard comes too close to allowing an automatic frisk
of anyone who commits a traffic violation in a high-crime
area.").  Here, Lopez was described as reaching toward his
waist, then reaching behind the passenger seat, as one would do
to conceal something.  This conduct is not nearly as susceptible
to an innocent explanation as McKoy's brief movement toward his
console.

Though I conclude that the officers were entitled to conduct an investigatory stop, I would be remiss if I failed to emphasize the narrowness of this holding. The Fourth Amendment does not permit a police officer on proactive patrol in a high-crime area to conduct a Terry stop simply because an individual reacts with surprise or nervousness to the officer's approach. See generally McKoy, 402 F. Supp. 2d 311. When the officer relies on the individual's reaction to supply reasonable suspicion for a stop, the officer must be able to point to articulable facts going beyond the surprise or nervousness one should expect to observe in any case. In this case, crediting Officer Rivera's account, he did not stop his patrol car and exit to investigate just because Mr. Lopez had reacted with surprise and nervousness. Rather, he stopped and undertook to investigate mainly because he saw Lopez reach with his right arm toward his waistband then extend his right arm over and behind the passenger seat as one would do in an attempt to conceal drugs or a gun. Only on this basis was the stop justified at its inception.[9]

---

[9] Lopez contends that use of the cruiser to block his car from exiting the lot "may be more evidence of an arrest not just an investigative stop" and that the officers did not have probable cause to arrest him at that time. However, a seizure is not necessarily an arrest, and a Terry stop remains a Terry stop so long as it is "reasonably related in scope to the circumstances which justified the interference in the first place" and does not "continue[] too long or become[] unreasonably intrusive."

D.  Legal Basis to Search the Vehicle

That the Terry stop in this case was justified at its

inception does not end the inquiry.  A lawful investigative

detention does not automatically entitle the police to frisk the

detained person.  See Terry, 392 U.S. at 30; McKoy, 402 F. Supp.

2d at 316 (warning of the dangers of converting Terry to permit

automatic frisks of stopped individuals).  "[T]o proceed from a

stop to a frisk, the police officer must reasonably suspect that

the person stopped is armed and dangerous." Johnson, 555 U.S.

at 326-27.  This rule can generate a difficult question when, as

here, the individual is removed from a vehicle in which the

officer suspects the individual possessed a weapon.

The principles of Terry permit a "search of the passenger

compartment of an automobile, limited to those areas in which a

weapon may be placed or hidden," provided the officer has a

---

United States v. McDow, 206 F. Supp. 3d 829, 853-54 (S.D.N.Y.
2016) (internal quotation marks omitted).  Lopez's reliance on
United States v. Valentine, 539 F.3d 88 (2d Cir. 2008), is
unavailing for the same reason.  In Valentine, the Second
Circuit concluded that the police lacked probable cause to
arrest Valentine because his "conduct could not have generated
anything more than a generalized suspicion that he was involved
in criminal conduct," and "[s]uch suspicions do not create
probable cause to arrest." Id. at 95.  The question here is not
whether the officers had probable cause to arrest Lopez, but
whether they had reasonable suspicion to conduct a Terry stop.
That requires only a "reasonable basis to think that the person
to be detained is committing or has committed a criminal
offense." Bailey, 743 F.3d at 332 (internal quotation marks
omitted).

reasonable belief "that the suspect is dangerous and the suspect may gain immediate control of weapons." Long, 463 U.S. at 1049. This includes situations, like those presented both here and in Long, where the suspect has been removed from his vehicle and the police reasonably believe that he would "pose[] a danger if he were permitted to reenter his vehicle." Id. at 1050. The rule announced in Long has been subject to some criticism. See Wayne R. LaFave, 4 Search & Seizure §9.6(e) (5th ed. Oct. 2019) (criticizing Long at length for the potential breadth of the decision, arguing that it "can easily be read as authorizing searches in a great many vehicle stop situations," and particularly criticizing the application of Long to situations where the suspect has been removed from his vehicle). It is nonetheless the law.

The facts here fit comfortably within the scope of Long's holding. As discussed above, Rivera was legally authorized to detain Lopez based on the movements he witnessed when shining the flashlight into Lopez's car. His loud instructions to Lopez to stop moving constituted the beginning of that process, and were lawful orders. See Swindle, 407 F.3d at 567 (holding that an officer may lawfully order someone to stop if the officer has a reasonable suspicion of illegal activity). Lopez's movements and his failure to comply caused Rivera to reasonably suspect he had a weapon. These circumstances justified a protective search

of the vehicle under <u>Long</u> and further distinguish this case from
<u>McKoy</u>.  <u>See</u> <u>McKoy</u>, 402 F. Supp. 2d at 317 (suggesting it would
be problematic to allow a frisk of suspects who "appear nervous
and move <u>before</u> [they are] told to freeze or get out of their
car") (emphasis in original).  <u>See also</u> <u>United States v.</u>
<u>Simmons</u>, 560 U.S. 98, 108 (2d Cir. 2009) (suspect's
noncompliance with lawful order contributed to reasonable
suspicion of criminal activity); <u>United States v. Johnson</u>, 212
F.3d 1313, 1316-17 (D.C. Cir. 2000) (protective search of
vehicle justified when defendant "continued to make 'shoving
down' motions, gestures that were the very opposite of complying
with [officer's] order, and which a reasonable officer could
have thought were actually suggestive of hiding (or retrieving)
a gun"); <u>United States v. Denney</u>, 771 F.2d 318, 322 (7th Cir.
1985) (defendant's "refusal to cooperate with the officers'
request to keep his hands in sight . . . intensified the
officers' reasonable concerns for their safety.  The officers
had reasonable basis to suspect that the occupant of the truck,
whose identity was not yet known to the officers, might be armed
and dangerous").  Accordingly, the search of the passenger
compartment of the vehicle that resulted in the seizure of the
gun did not violate the Fourth Amendment.[10]

--------

[10] The gun may also have been in plain view but, in light of my
conclusion that the protective sweep of the vehicle was

III. <u>Conclusion</u>

For the foregoing reasons, the motion to suppress is hereby denied.

So ordered this 10th day of January 2020.

_____/s/_RNC_____
Robert N. Chatigny
United States District Judge

---

justified by a reasonable suspicion that Lopez was armed, it is unnecessary to reach that issue.